**FILED**

7/19/2022

Clerk, U.S. District Court
District of Montana
Billings Division

# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF MONTANA
## BILLINGS DIVISION

| | |
|---|---|
| THE NORTHERN CHEYENNE TRIBE, <br><br> Plaintiff, <br><br> v. <br><br> THE UNITED STATES OF AMERICA; the UNITED STATES DEPARTMENT OF THE INTERIOR; the BUREAU OF INDIAN AFFAIRS; DEBRA HAALAND, in her official capacity as Secretary of the Interior; BRYAN NEWLAND, in his official capacity as Assistant Secretary of the Interior-Indian Affairs; and STEVEN JUNEAU, in his official capacity as Director, Bureau of Indian Affairs-Office of Justice Services, <br><br> Defendants. | CV-22-75-BLG-SPW-TJC <br><br><br> **COMPLAINT** |

Plaintiff, by and through the undersigned attorneys, for its Complaint against the Defendants, hereby alleges as follows:

## INTRODUCTION

1.     This is an action by the Northern Cheyenne Tribe ("Tribe" or "Plaintiff") seeking declaratory and injunctive relief against the United States of America ("United States" or "Defendant") for breaches of fiduciary duties by the

1

United States, acting by and through its Department of the Interior and its Secretary and Assistant Secretary–Indian Affairs, and the Bureau of Indian Affairs–Office of Justice Services, as trustees.  This action arises out of the United States' breach of statutory, regulatory, and common law trust duties owed to the Tribe.

2.      The United States breached its solemn fiduciary duties to the Tribe by failing to provide adequate law enforcement services to the Tribe.

3.      Since at least 2018, Defendants have failed to provide competent and effective law enforcement and corrections services to the Tribe's Reservation, despite the Tribe's repeated demands that Defendants address the problem.

4.      The Tribe made many requests to Defendants in the last few years to increase staffing of the Tribe's police department, to improve the Tribe's local and regional detention facilities so they can be fully utilized by the police department, and to improve the police department's responsiveness and professionalism so that calls for service are not ignored and crimes are properly investigated.  *See* Exhibit 1 (May 10, 2022 Letter from Northern Cheyenne President Serena Wetherelt to Assistant Secretary–Indian Affairs Bryan Newland) at footnote 1.  Before filing this suit, the Tribe afforded the United States a final opportunity to provide adequate law enforcement services and received <u>no</u> response.  Defendants continue to provide unlawfully inadequate law enforcement services to the Tribe.

//

2

<u>PARTIES</u>

5.    Plaintiff is a federally recognized Indian tribe organized pursuant to Section 16 of the Indian Reorganization Act of 1934, 48 Stat. 987 (codified at 25 U.S.C. § 5123).  The Tribe operates and governs under a constitution approved by the Bureau of Indian Affairs on May 31, 1996.  Accordingly, the Tribe possesses all legal rights afforded to federally recognized Indian tribes.  The Tribe governs and occupies the Northern Cheyenne Reservation in Montana.

6.    The Tribe brings suit on behalf of itself and its members.

7.    Defendant United States, acting by and through the Department of the Interior, the Secretary of the Interior, Assistant Secretary of the Interior–Indian Affairs, the Bureau of Indian Affairs, and BIA's Office of Justice Services, as a matter of federal statutory, regulatory, and common law, is trustee and a fiduciary to the Northern Cheyenne Tribe and is charged with carrying out trust duties and responsibilities with regard to providing law and order within the Tribe's Reservation.  The Secretary of the Interior, as the principal agent of the trustee United States, has continuously reaffirmed that the trust responsibilities of the United States to the Tribe are well-established, originated with the formation of the United States, and are an ongoing obligation.  Secretarial Order No. 3335 (Aug. 20, 2014).  The Secretarial Order states (at § 3a) that "[t]he trust responsibility consists of the highest moral obligations that the United States must meet to ensure the protection of tribal

3

and individual Indian lands, assets, resources, and treaty and similarly recognized rights."

8.     Defendant United States Department of the Interior ("DOI") is an executive department of the United States organized and existing under 5 U.S.C. § 101, as amended.   Defendant DOI is responsible for, among other things, the supervision, management, direction, and oversight of Defendant Bureau of Indian Affairs, which is a federal agency subsidiary of DOI, pursuant to 43 U.S.C. § 1457(10).

9.     In its role as a subsidiary bureau of DOI, Defendant Bureau of Indian Affairs ("BIA") is responsible for administering Federal Indian policy; fulfilling its federal trust responsibilities to American Indians, tribal governments, and Alaska Natives; and promoting tribal self-determination and self-governance.

10.     Defendant Debra Haaland, or her successor, is the Secretary of the Department of Interior of the United States of America (the "Secretary") and is being sued in her official capacity as an officer and agent of the United States Government. The Secretary, as head of an executive department, reports directly to the President of the United States, *see* 43 U.S.C. § 1451, and is responsible for directing and supervising all operations and activities of DOI, including providing law enforcement services to tribes and supervising expenditure of appropriated funds by the BIA under 25 U.S.C. § 13.

11.     Defendant Bryan Newland, or his successor, is the Assistant Secretary–Indian Affairs of the Department of Interior of the United States of America, Bureau of Indian Affairs, (the "Assistant Secretary") and is being sued in his official capacity as an officer and agent of the United States Government.   The position of the Assistant Secretary–Indian Affairs is established under the authority contained in 43 U.S.C. §1453.   The Assistant Secretary is the second-highest executive branch official for Indian affairs and discharges the duties of the Secretary with the authority and direct responsibility to strengthen the government-to-government relationship with Indian tribes; advocate policies that support tribal self-determination; protect and preserve Indian trust assets; and administer a wide array of laws, regulations, and functions relating to Indian tribes, Alaska Natives, individual Indian tribal members, and Indian affairs that are vested in the Secretary by the President and the Congress of the United States.   The Assistant Secretary is directly responsible with the Secretary for the decisions made by the Department of Interior, Bureau of Indian Affairs and its officers and employees in providing law enforcement services to tribes.

12.     Defendant Steven Juneau, or his successor, is a deputy to defendant Newland, with the official title of Acting Deputy Bureau Director, Office of Justice Services.   He is the highest-level BIA official with exclusive law enforcement responsibilities and received a delegation from defendant Newland to carry out those

responsibilities.  *See* Indian Affairs Manual Part 3 Ch. 5.[1]  As explained on the Bureau

of Indian Affairs–Office of Justice Services ("BIA-OJS") website,[2] BIA-OJS is the

exclusive federal entity charged with maintaining law and order on Indian

reservations[,]" and its mission is to

> uphold Tribal sovereignty and provide for the safety of Indian
> communities by ensuring the protection of life and property, enforcing
> laws, maintaining justice and order, and by ensuring that sentenced
> American Indian offenders are confined in safe, secure, and humane
> environments.  Ensuring public safety and justice is arguably the most
> fundamental of government services provided in Tribal communities.

<u>JURISDICTION</u>

13.    This Court has jurisdiction over the subject matter under 28 U.S.C. §§

1331, 1361 and 1362 because this is a civil action arising under the Constitution, laws

and treaties of the United States, including 5 U.S.C. § 702; 25 U.S.C. §§ 13, 2801,

2802 and 3601; 18 U.S.C. §§ 1152 and 1153; the 1868 Treaty of Fort Laramie, 15

Stat. 655 (May 10, 1868); 25 C.F.R. Part 12; and the common law of trusts; and is

brought by an Indian tribe with a governing body duly recognized by the Secretary

of the Interior, to compel Defendants to perform duties owed to Plaintiff.

14.    The United States has waived its sovereign immunity under 5 U.S.C. §

---

[1] Available at: https://www.bia.gov/sites/default/files/dup/assets/public/raca/
manual/pdf/3IAM5DelegationofAuthority_Director_BIAtoDeputyBureauDirector_
JusticeServices5-17-2010.pdf (last viewed July 12, 2022).

[2] Available at: https://www.bia.gov/bia/ojs (last viewed July 5, 2022).

702 because this is an action in federal court seeking relief other than money damages and/or stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity.

## VENUE

15.    Venue is proper in the District of Montana under 28 U.S.C. § 1391(b) and (e) because an officer or employee of the United States is a defendant and a substantial part of the events or omissions giving rise to the claim occurred in this District, *i.e.*, within the Northern Cheyenne Reservation.

## APPLICABLE LAW

### Breach of Trust

16.    A tribe may properly bring a breach of trust claim against the federal government when it "identif[ies] a substantive source of law that establishes specific fiduciary or other duties, and allege[s] that the Government has failed faithfully to perform those duties." *United States v. Navajo Nation*, 537 U.S. 488, 506 (2003) (citing *United States v. Mitchell*, 463 U.S. 206, 216-17, 219 (1983)). "A substantive right must be found in some . . . source of law, such as the Constitution, or any Act of Congress, or any regulation of an executive department." *Mitchell*, 463 U.S. at 216 (internal quotation omitted).

17.    Declaratory, injunctive and equitable relief are traditional remedies for violation of trust duties. *Cobell v. Norton*, 240 F.3d 1081, 1101 (D.C. Cir. 2001).

18. In interpreting a substantive source of law to determine whether a specific fiduciary duty is established, "'[s]tatutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit.'" *Swinomish Indian Tribal Cmty. v. BNSF Ry. Co.*, 951 F.3d 1142, 1156 (9th Cir. 2020) (quoting *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985)).

<u>Indian Country Law Enforcement</u>

19. The long-standing trust relationship between the United States and the Tribe, and the fiduciary duties assumed by the United States, are rooted in and derived from multiple treaty, statutory and regulatory provisions governing the administration of law and order within Indian country.

20. Article 1 of the Treaty of Fort Laramie with the Northern Cheyenne and Northern Arapaho, 15 Stat. 655 (May 10, 1868) provides:

> From this day forward peace between the parties to this treaty shall forever continue. The government of the United States desires peace, and its honor is hereby pledged to keep it. The Indians desire peace, and they hereby pledge their honor to maintain it. If bad men among the whites, or among other people subject to the authority of the United States, shall commit any wrong upon the person or property of the Indians, the United States will, upon proof made to the agent and forwarded to the Commissioner of Indian Affairs at Washington City, proceed at once to cause the offender to be arrested and punished according to the laws of the United States, and also reimburse the injured person for the loss sustained.

21. In multiple federal statutes, Congress has since recognized that ensuring adequate civil and criminal justice systems is part of the federal responsibility to

tribes and their members.

22.     The Indian Law Enforcement Reform Act ("ILERA"), 25 U.S.C. Ch.
30, establishes and memorializes the federal government's duty to provide law
enforcement services to Indian tribes.  25 U.S.C. § 2802 states in relevant part:

> **(a) Responsibility of the Secretary.**  The Secretary [of the Interior],
> acting through the Bureau [of Indian Affairs], <u>shall be responsible for
> providing</u>, or for assisting in the provision of, <u>law enforcement services
> in Indian country</u> as provided in this Act.
> **(b) Office of Justice Services.**  There is established in the Bureau an
> office, to be known as the "Office of Justice Services", that, under the
> supervision of the Secretary, or an individual designated by the
> Secretary, <u>shall be responsible for</u>—
>> (1)<u> carrying out the law enforcement functions of the Secretary in
>> Indian country</u>, and
>> (2) implementing the provisions of this section.
> **(c) Additional responsibilities of the Office.**  Subject to the provisions
> of this chapter and other applicable Federal or tribal laws, <u>the
> responsibilities of the Office of Justice Services in Indian country shall
> include</u>—
>> (1) the <u>enforcement of Federal law and</u>, with the consent of the Indian
>> tribe, <u>tribal law</u>;
>> (2) in cooperation with appropriate Federal and tribal law
>> enforcement agencies, the <u>investigation of offenses against criminal
>> laws </u>of the United States;
>> (3) the <u>protection life and property</u>;
>> ***
>> (5) the <u>provision of criminal justice remedial actions, correctional
>> and detention services, and rehabilitation</u> … .

(Boldface in original; underscore added).

23.     The Tribal Law and Order Act ("TLOA"), 25 U.S.C. § 2801 note, P.L.
111-211, provides that "the United States has <u>distinct legal, treaty, and trust
obligations to provide for the public safety of Indian country</u> … ."  (Emphasis added).

24.     The legislative history of the TLOA confirms that Congress enacted the TLOA in furtherance of the United States' trust responsibility for Indian country law enforcement.  "The result of these federal laws and Court decisions is that along with the authority that the United States imposed over Indian tribes, it incurred significant legal and moral obligations to provide for public safety on Indian lands."  S. Rep. 111-93, at 4 (2009).  In an October 2009 letter, U.S. Assistant Attorney General Ronald Weich explained to Senator Byron Dorgan, "[o]ur responsibility to preserve public safety for Indian Country derives from the government to government relationship between the federal government and tribal governments, as well as specific statutes, such as the Major Crimes Act and the Indian Country Crimes Act, that provide for federal jurisdiction for serious felonies."  *Id.* at n.16.

25.     In the TLOA, Congress also found that "less than 3,000 tribal and Federal law enforcement officers patrol more than 56,000,000 acres of Indian country, which reflects less than ½ of the law enforcement presence in comparable rural communities nationwide[.]"  25 U.S.C. § 2801 note, P.L. 111-211(a)(3).

26.     The Indian Tribal Justice Support Act, 25 U.S.C. Ch. 38, at 25 U.S.C. § 3601 states:

> Congress finds and declares that—
> ***
> (2) the United States has a trust responsibility to each tribal government that includes the protection of the sovereignty of each tribal government;
> ***

> (5) <u>tribal justice systems are an essential part of tribal governments</u> and serve as important forums for <u>ensuring public health and safety</u> and the political integrity of tribal governments ….

(Emphasis added).

27.    The Indian Country Crimes Act, 18 U.S.C. § 1152, states that "[e]xcept as otherwise provided by law, <u>the general laws of the United States</u> as to the punishment of offenses committed in any place within the sole and exclusive jurisdiction of the United States … <u>shall extend to the Indian country</u>." (Emphasis added).

28.    The Major Crimes Act, 18 U.S.C. § 1153, states: "Any Indian who commits against the person or property of another Indian or other person any of the following offenses [major crimes enumerated]… shall be subject to the same law and penalties as all other persons committing any of the above offenses, <u>within the exclusive jurisdiction of the United States</u>." (Emphasis added).

29.    The Snyder Act, 25 U.S.C. § 13, further evinces congressional intent to fund law enforcement personnel for tribes:

> The Bureau of Indian Affairs, under the supervision of the Secretary of the Interior, <u>shall direct, supervise, and expend such moneys</u> as Congress may from time to time appropriate, <u>for the benefit, care, and assistance of the Indians</u> throughout the United States for the following purposes: … [including] <u>For the employment of</u> … physicians, <u>Indian police</u> ….

(Emphasis added).

30.     The regulations promulgated by BIA to "ensure that law enforcement, crime prevention and recidivism reduction programs are implemented and maintained in … compl[iance] with the [ILERA]" also set forth and reinforced the agency's duty to provide law enforcement services for tribes.  62 Fed. Reg. at 15610 (April 2, 1997).

31.     The regulations establish, *inter alia*:

> It is not fair to law abiding citizens of Indian country to have anything less than a professional law enforcement program in their community.  Indian country law enforcement programs that receive Federal funding and/or commissioning will be subject to a periodic inspection or evaluation to provide technical assistance, to ensure compliance with minimum Federal standards, and to identify necessary changes or improvements to BIA policies.

25 C.F.R. § 12.12 (emphasis added).   Additionally, "[t]he Commissioner of Indian Affairs, or in the absence of a Commissioner, the Deputy Commissioner, is responsible for Bureau of Indian Affairs-operated and contracted law enforcement programs, and for overall policy development and implementation of the [ILERA]." 25 C.F.R. § 12.1.

32.     Finally, the notice of promulgation of these regulations as a final rule expressly stated that ILERA specified changes for the BIA and tribal law enforcement and detention programs to be implemented as rules by "the Secretary of the Interior who was given the overall responsibility for providing or assisting in the provision

of <u>law enforcement services in Indian country</u>….” 62 Fed. Reg. at 15610 (emphasis added).

33.    The statutes and regulations describing the United States' duties to provide law and order within Indian country create specific fiduciary duties owed to Plaintiff by Defendants.

34.    The United States, through DOI, BIA-OJS, the Secretary of the Interior and the Assistant Secretary–Indian Affairs, has managed the Tribe's law enforcement program and assumed responsibility for ensuring law and order within the Reservation.

35.    The United has assumed the obligations of a trustee for law and order on the Reservation.

36.    As trustee, the United States has a fiduciary relationship and obligations of the highest responsibility to administer the trust with the greatest skill and care possessed by the trustee; its conduct "'should therefore be judged by the most exacting fiduciary standards.'"  *Cobell*, 240 F.3d at 1099 (quoting *Seminole Nation v. United States*, 316 U.S. 286, 297 (1942)); *Shoshone Indian Tribe v. United States*, 364 F.3d 1339, 1348 (Fed. Cir. 2004); *Jicarilla Apache Nation v. United States*, 112 Fed. Cl. 274, 287 (2013).

//

//

## ALLEGATIONS

### The Tribe and Its Reservation

37.     The Northern Cheyenne Tribe has approximately 11,521 members.  The Northern Cheyenne Indian Reservation ("the Reservation") is located in present-day southeastern Montana, and is approximately 444,000 acres in size with 99% tribal ownership.  Approximately 5,000 members of the Tribe reside on the Reservation.  The Reservation lies within Big Horn and Rosebud Counties.

38.     The Reservation was first established by Executive Order dated November 26, 1884, and extended March 19, 1900.  In 1926, Congress passed the Northern Cheyenne Allotment Act to secure the Reservation's land and resources "for the permanent use and occupation of the Northern Cheyenne Indians" by declaring that all property within the Reservation belongs to the Tribe.  44 Stat. 690 (June 3, 1926).

39.     The Reservation is Indian country under 18 U.S.C. § 1151.

40.     There are several federal and state highways that cross the Reservation, including U.S. Highway 212, Montana Highway 39 and Montana Highway 314.

41.     As a sovereign governing its Reservation and its members, the Tribe has a strong interest in its members' health, well-being and safety.  The population of the Reservation is substantially harmed by violent crime, crimes against children and vulnerable adults, missing persons, drug-related crime and the resulting impacts to

the entire Reservation community.

42.     Between 2019 and 2020, reported violent crime on the Reservation increased 50%.  This does not account for crime that goes underreported, which is likely significant.  Only 50% of the reported violent crimes in 2020 were cleared.

43.     Big Horn and Rosebud Counties, within which the Reservation lies, have the highest rates of missing people per capita in the state of Montana.  However, Defendants have acknowledged that there is no reliable count of how many Native people go missing or are killed each year.  Federal data from August 2021 indicated 17 Northern Cheyenne Tribal members were missing persons during that month— the third highest total of all tribes in the United States.

44.     There is a lack of complete, accurate and detailed data regarding crime and law enforcement within the Reservation.

<u>The Reservation's Criminal Justice System</u>

45.     Law enforcement on the Reservation is a complex system of state, federal and Tribal authority.  The federal government is responsible for virtually all elements of the criminal law enforcement and justice systems pertaining to the Northern Cheyenne Reservation.   Currently, BIA-OJS funds four distinct but overlapping law enforcement functions within and for the Reservation: uniformed patrol, criminal investigations, dispatch/telecommunications, and corrections.

46.     The uniformed patrol function serves as the "Tribal police" in that they

15

are responsible for responding to calls for service and executing general law enforcement functions within the Reservation.  All uniformed patrol officers on the Reservation are funded, employed and managed by BIA-OJS.

47.    Both federal criminal laws and the Tribe's Criminal Offense Code should be enforced by BIA law enforcement.  However, BIA-OJS officers routinely display ignorance of both federal and Tribal laws as well as their own jurisdiction. BIA-OJS officers have told citizens within the Reservation that there are no Tribal laws against theft and that the officers have no jurisdiction on fee land within the Reservation.  Both statements are factually and legally incorrect.

48.    The criminal investigation function has responsibility for investigating all major crimes on the Reservation, as defined by the Major Crimes Act, 18 U.S.C. § 1153, and presenting them to federal prosecutors.  Criminal investigators work with the United States Department of Justice, Federal Bureau of Investigation, and Drug Enforcement Agency.

49.    Until recently, all criminal investigators on the Reservation were funded, employed and managed by BIA-OJS.

50.    The Tribe recently contracted with BIA-OJS to assume the Bureau's criminal investigation functions under the Tribally-administered Northern Cheyenne Investigative Services.  Obtaining that contract was the culmination of a multi-year process that entailed the Tribe suing BIA to enter into the contract pursuant to the

Indian Self-Determination and Education Assistance Act ("ISDEAA"), 25 U.S.C. § 5301 *et seq*. *See Northern Cheyenne Tribe v. United States of America, et al.,* No. 20-cv-00183-SPW-TJC (D. Mont.) (filed Dec. 15, 2020). BIA-OJS initially denied the contract and claimed that only $203,486 in annual funding was available to the Tribe to operate the criminal investigation program; however, after the Tribe sued to enforce BIA-OJS' contracting obligations, BIA-OJS awarded the Tribe the contract with $453,717 in annual funding. This amount is still far less than what the Tribe estimated it needs to operate a quality, professional criminal investigation unit. Thus, the criminal investigation function remains funded by BIA-OJS, but as of early 2022, is operated by the Tribe.

51.     Other than the contracted criminal investigation function, BIA-OJS provides all other law enforcement functions to the Tribe on a direct-service basis.

52.     BIA-OJS also funds drug agents and missing/murdered Indigenous persons ("MMIP") agents on a national basis to provide specialized investigative services to tribes. For multiple years, no drug enforcement officers were assigned to Northern Cheyenne; when the Tribe attempted to contract a drug enforcement officer position via the ISDEAA, BIA refused. In early 2022, BIA hired two drug enforcement officers to be based in Billings, but these officers have been detailed away from the Reservation a portion of the time since they were hired. There are no MMIP agents assigned to the Reservation, despite the high rate of missing persons.

17

53.   All detention facilities that serve the Reservation are funded and administered by Defendants.   The local Lame Deer Adult Detention Center ("LDADC") is located within the Reservation.  After operating for many years, BIA closed it in 2019.  It reopened in June 2021 as a temporary hold facility for no more than nine detainees, who can be held up to only eight hours and only on intoxication charges.  The primary adult detention facility for the Northern Cheyenne Reservation is the Rocky Mountain Regional Detention Facility ("RMRDF") in Hardin, Montana, which opened in April 2019.  The RMRDF is 56 miles from the Tribe's headquarters in Lame Deer.   However, BIA also frequently sends detainees from Northern Cheyenne to contracted detention facilities in Oklahoma, approximately 1,000 miles away.

Defendants Fail to Fulfill the United States' Law Enforcement Obligations

54.   The United States is obligated to provide adequate law enforcement services within the Reservation.

55.   The United States breached the above duties owed to the Northern Cheyenne Tribe and its people in many ways, including by: (1) failing to maintain adequate staffing levels; (2) failing to respond to calls for service; (3) failing to investigate crimes; (4) failing to refer cases for prosecution; (5) failing to maintain adequate local and regional detention facilities; and (6) failing to provide adequate rehabilitative services.

56.     Defendants consistently fail to adequately staff the Reservation with competent law enforcement personnel.  There is no data or staffing analysis that supports BIA-OJS' determination that this is the appropriate staffing level for the Reservation.

57.     BIA-OJS routinely fails to ensure that even the budgeted level of staffing is met.  The Tribe's attempts to obtain accurate information about officer staffing is frustrated by BIA-OJS issuing reports that are misleading, inaccurate and incomplete.  According to one such report issued in March 2022 (attached to Exhibit 1), BIA-OJS "filled" 21 of 25 available positions with one acting chief of police, two supervisory police officers, 14 police officers and one school resource officer. However, that does not equal 21 positions.  BIA-OJS indicated that four police officers are "in hiring process," leaving the Tribe guessing about how many officers are actually serving the Reservation.  The most recent staffing report indicates that there are 20 BIA uniform police personnel positions on the Reservation, with 12 of those positions "filled" but only three  "filled and currently working."  *See* Exhibit 2 (BIA Office of Justice Services Weekly Briefing Report, July 11, 2022).   An unknown number of officers are stationed in Billings, on administrative leave, or "detailed out," meaning they are assigned to another reservation and not currently available to work at Northern Cheyenne, or stationed elsewhere.

58.     The turnover rate of staff assigned to the Northern Cheyenne

Reservation is high.  Without a permanent chief of police, officers from outside the Reservation rotate through as "acting" chiefs, often staying only 30 days before being replaced by another officer in "acting" status.

59.     Even when the patrol function is "fully staffed," there are usually only two patrol officers on duty at a time.  Those two officers must patrol and respond to calls for service within the entire 444,000-acre Reservation.

60.     Staffing limitations result in officers being unable to respond to calls for service appropriately or adequately discharge their other necessary law enforcement functions.

61.     Northern Cheyenne Tribal members are accustomed to calling 911, which is administered by BIA-OJS under its telecommunication/dispatch function, for emergency assistance.  The 911 response is poor.  Often BIA-OJS responds too late to calls for service due to lack of staffing.

62.     At one point in recent years, the lack of responsiveness of BIA law enforcement led some Tribal members to form their own vigilante group.  Calling themselves "The People's Camp," they attempted to fill the void left by Defendants' failures by responding to calls for service.   On several occasions, BIA-OJS dispatchers directed 911-callers seeking BIA assistance to "call the People's Camp" instead.

63.     When BIA-OJS does respond to calls for service within the Reservation,

the response is inadequate because officers lack basic knowledge of Indian country criminal jurisdiction, federal law and Tribal law, and at times, lack professionalism or knowledge of proper procedures.

64.    BIA-OJS has failed to properly collect and store evidence, failed to properly complete police reports, failed to appear for Tribal Court hearings, and otherwise failed to properly investigate crimes and refer them for prosecution.  The Tribal Prosecutor has dismissed cases in Tribal Court because Defendants' officers failed to properly document their investigations or neglected to appear for hearings. Cases that could have been charged and prosecuted as federal crimes have not been so charged or referred for prosecution because Defendants' officers failed to properly complete their reports and/or investigate the crimes.

65.    BIA-OJS has failed to maintain adequate local detention facilities.  In 2019, BIA decided to close the local LDADC due to overcrowding and the facility's poor condition.  The Tribe repeatedly asked BIA to re-open the LDADC in any capacity in the short term while working toward fully re-opening the facility to full capacity.  In 2021, the LDADC re-opened but can only accept up to nine intoxicated individuals and hold them for only eight hours.  On February 1, 2022, BIA-OJS informed the Tribe that "[t]here are no plans to further renovate or open the facility beyond a temporary hold status for intoxication charges."

66.    Unless the LDADC is opened beyond its current limitations, there is no

21

local jail to hold persons convicted on Tribal charges or to hold arrestees on charges other than intoxication. This severely hampers the Tribal Court's functioning. Since the LDADC's closure, with no place to detain persons other than temporarily, BIA routinely fails to cite or detain offenders. BIA-OJS officers often release persons suspected of crimes back into the community where they continue to commit offenses against the Tribe and its members. BIA-OJS officers drop suspects off at the two homeless shelters within the Reservation rather than transporting and booking them at proper detention facilities.

67.    Since April 2019, BIA utilizes the RMRDF through a contract with the facility to house BIA-OJS detainees. It is a 400-bed facility but currently accepts only approximately 100 inmates, which is further divided between detainees from the Crow Reservation and the Northern Cheyenne Reservation. Due to this limitation, BIA-OJS does not have sufficient space to house all persons who should be arrested and detained on the Northern Cheyenne Reservation. Also, the social and rehabilitative services that were supposed to be provided at RMRDF are not available.

68.    In contrast to the LDADC, the RMRDF is not well located for the Northern Cheyenne community. If an arrestee should be detained for longer than eight hours and for any reason other than intoxication, law enforcement personnel must dedicate at least two hours for round-trip travel between Lame Deer and Hardin.

69.     Because the RMRDF has limited capacity, inmates from Northern Cheyenne are often held at BIA contract facilities in Oklahoma, including a facility in Kay County, Oklahoma.  This is nearly a 2,000-mile roundtrip from Lame Deer, and BIA-OJS only transports inmates between Montana and Oklahoma approximately once per month.

70.     The majority of persons detained by BIA-OJS under Northern Cheyenne Tribal Court orders or on Tribal law charges are held for drug- or alcohol-related offenses.  Defendants have failed to provide adequate rehabilitative services to criminal law offenders, which results in high recidivism rates.  The Tribal Court has a Healing-to-Wellness Program, also known as "drug court," to help connect non-violent drug offenders with services to minimize recidivism.  To participate in the Healing-to-Wellness Program, offenders must have access to services in Lame Deer and appear before the Tribal Court once per week.  Inmates being held in distant facilities are unable to participate in the program and since the local LDADC closed, participation in the Healing-to-Wellness program has declined.

71.     There are hundreds, and perhaps over 1,000, open arrest warrants for persons who might be found within the Reservation.  Because of the lack of adequate detention space, these warrants go unenforced.

72.     The Tribe has attempted to prop up this failing federal system with multiple Tribal actions meant to increase public safety and enhance law and order.

23

For example, the Tribal Council passed several iterations of criminal offense laws for BIA-OJS to enforce and contracted with BIA-OJS for the Tribe to assume operation of the criminal investigation function within the Reservation.

73.    Additionally, the Tribe hired two former BIA police officers and one former BIA corrections official to create the Northern Cheyenne Investigative Services ("NCIS").  NCIS has assumed responsibility for staffing Tribal checkpoints and attempting to enforce Tribal laws using the Tribe's inherent authority.  To date, the Tribe spent over $1,000,000 of its own funds to provide law enforcement services that Defendants have failed to provide.

74.    On May 10, 2022, the Tribe sent Defendants a final request for action. *See* Exhibit 1.  That letter demanded immediate action to increase staffing of the Tribe's police department, fully reopen the LDADC, and address capacity limitations at the RMRDF within 60 days.

75.    As of today's date, Defendants have not responded to the Tribe's letter.

76.    Defendants' failure to act is a breach of treaty promises and mandatory duties owed to the Tribe and caused the Tribe to suffer a legal wrong which is a final agency action reviewable and redressable by this Court.

## CLAIM I:  DECLARATORY RELIEF

1.    The Tribe realleges and incorporates by reference the allegations contained in paragraphs 1 through 76 above.

2.      Under 25 U.S.C. §§ 13, 2801, 2802 and 3601; 18 U.S.C. §§ 1152 and 1153; the 1868 Treaty of Fort Laramie, 15 Stat. 655 (May 10, 1868); 25 C.F.R. Part 12; the common law of trusts, and other statutes, regulations and applicable law, Defendants have fiduciary duties as a trustee to provide adequate law enforcement services sufficient to protect public safety and ensure law and order within the Tribe's Reservation.

3.      Under the 1868 Treaty of Fort Laramie, Defendants have a duty to arrest and punish any person who commits a wrong upon the person or property of the Tribe and its members.

4.      The United States breached its statutory, fiduciary and treaty duties as alleged above.

5.      The Tribe asks the Court to declare that the Defendants have failed to fulfill their legal obligations to the Tribe to provide law and order within the Tribe's Reservation.

<u>CLAIM II:  MANDAMUS RELIEF</u>

1.      The Tribe realleges and incorporates by reference the allegations contained in paragraphs 1 through 76 above.

2.      Under the Treaty, statutes, regulations and applicable law, Defendants have nondiscretionary duties to provide law and order within the Tribe's Reservation.

25

3.     Defendants have nondiscretionary duties to comply with the Treaty, statutes and regulations cited herein.

4.     Defendants have failed to perform their nondiscretionary duties to the Tribe.

5.     There is no adequate administrative remedy available to the Tribe.

## CLAIM III: INJUNCTIVE RELIEF

1.     The Tribe realleges and incorporates by reference the allegations contained in paragraphs 1 through 76 above.

2.     Because of Defendants' failure to provide law and order within the Tribe's Reservation, the Tribe has suffered irreparable injury and remedies at law are not available to compensate for those injuries.

3.     The balance of hardships strongly favors injunctive relief and such relief is in the public interest.

## CLAIM IV: EQUITABLE RELIEF

1.     The Tribe realleges and incorporates by reference the allegations contained in paragraphs 1 through 76 above.

2.     The Tribe spent its own funds to provide law enforcement functions that should have been provided by Defendants using federal funds, which failure was in breach of Defendants' fiduciary and treaty duties.

3.      The Tribe seeks reimbursement and restitution from Defendants of funds that the Tribe spent on law enforcement functions that should have been funded and provided by Defendants, in an amount to be determined at trial.

PRAYER FOR RELIEF

WHEREFORE, the Tribe respectfully requests that the Court:

1.      Declare that Defendants breached their statutory, fiduciary and treaty duties, and failed to fulfill their legal obligations to the Tribe to provide law and order within the Tribe's Reservation.

2.      Enjoin Defendants to take immediate action to remedy their failures, including permanent measures to ensure adequate patrol officers within the Reservation at all times and adequate local detention facilities, and any other relief necessary to ensure that Defendants fulfill their legal obligations as declared by the Court.

3.      Retain jurisdiction over Defendants for the purpose of ensuring compliance with the Court's orders and order Defendants to provide periodic reports to the Tribe and the Court regarding their efforts to fulfill their legal obligations as declared by the Court.

4.      Award the Tribe equitable restitution and reimbursement in an amount to be determined.

5.    Award the Tribe its costs and attorneys' fees incurred herein under 28

U.S.C. § 2412 and any other applicable law.

6.    Award such other relief as the Court deems just and equitable.

Dated this 19th day of July, 2022.

Respectfully submitted,

/s/ Anna E. Brady
Anna E. Brady, Montana Bar #66826441
Brian W. Chestnut, WA Bar #23453 (*pro hac vice*
   pending)
Beth Baldwin, WA Bar #46018 (*pro hac vice*
   pending)

ZIONTZ CHESTNUT
2101 Fourth Avenue, Suite 1230
Seattle, WA 98121
Tel. (206) 448-1230
Fax (206) 448-0962
abrady@ziontzchestnut.com
bchestnut@ziontzchestnut.com
bbaldwin@ziontzchestnut.com

*Attorneys for Plaintiff*