## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF MONTANA
## BILLINGS DIVISION

| | |
|---|---|
| THE NORTHERN CHEYENNE TRIBE, | |
| Plaintiff, | |
| v. | No. CV 22-75-BLG-SPW-TJC |
| THE UNITED STATES OF AMERICA; the UNITED STATES DEPARTMENT OF THE INTERIOR; the BUREAU OF INDIAN AFFAIRS; DEBRA HAALAND, in her official capacity as Secretary of the Interior; BRYAN NEWLAND, in his official capacity as Assistant Secretary of the Interior-Indian Affairs; and RICHARD MELVILLE, in his official capacity as Director, Bureau of Indian Affairs-Office of Justice Services, | **PLAINTIFF'S PRELIMINARY PRETRIAL STATEMENT** |
| Defendants. | |

Plaintiffs hereby submit this Preliminary Pretrial Statement pursuant to Local Rule 16.2(b)(1) and the Court's September 1, 2023 Order (ECF No. 37).

**1.    Brief Factual Outline of the Case**

Plaintiff is a federally recognized Indian tribe governing and occupying the Northern Cheyenne Reservation ("the Reservation") in southeastern Montana.  The

Reservation is approximately 444,000 acres and home to approximately 5,000 Tribal members.

Defendants are obligated by federal law to provide adequate law enforcement services to Plaintiff within its Reservation. This obligation is outlined in federal statutes, regulations and at least one treaty between the United States and Plaintiff. The Bureau of Indian Affairs, Office of Justice Services ("BIA-OJS") provides uniformed patrol, dispatch and corrections functions to the Tribe on a direct-service basis, and oversight and funding via a self-determination contract for the Tribe to provide criminal investigations services. Since at least 2018, Defendants have continuously failed to provide competent and effective law enforcement and corrections services to the Tribe's Reservation, despite the Tribe's repeated requests for Defendants to rectify the issues.

Defendants fail to maintain adequate police staffing levels. There are frequently only two patrol officers on duty, with responsibility as first responders for the entire Reservation. Two on-duty officers are insufficient. The nearest jail for holding arrestees is a 2-hour round trip from Lame Deer, which means that if one officer is transporting prisoners, only one officer is left on duty on the Reservation to provide police services to 5,000 people spread across 444,000 acres.

Defendants' officers fail to timely respond to calls for service by Tribal members and sometimes fail to respond at all. As a result, Tribal members often

choose to not call for police services when crimes are committed, instead engaging in self-help.

Defendants fail to properly handle evidence and refer cases for prosecution. The Tribal Prosecutor has dismissed cases in Tribal Court because Defendants' officers failed to properly document their investigations or neglected to appear for hearings. Federal prosecutions have failed to result in convictions due to Defendants' sloppy and incompetent police work.

Defendants fail to maintain adequate local and regional detention facilities. Defendants closed the Lame Deer Adult Detention Center ("LDADC"), the only jail on the Reservation, in 2019 after letting the facility deteriorate for years. They reopened the LDADC in 2021 but only for 8-hour holds of up to nine individuals held on intoxication charges. In 2022 Defendants unilaterally decided to use the LDADC for temporarily holding juveniles.  Currently, there is no local facility to hold adult offenders within the Reservation. The primary detention facility is now the Rocky Mountain Regional Detention Facility ("RMRDF") in Hardin, 56 miles away, but due to understaffing, it too is insufficient.  The RMRDF is a regional facility that serves multiple Tribes, but is currently limited to 25% capacity by Defendants.  Defendants' response to these problems is to ship Northern Cheyenne detainees to contract facilities in Oklahoma, over 1,000 miles away.

Defendants have failed to provide adequate rehabilitative services to offenders, which results in high recidivism rates. The majority of persons detained by Defendants under Northern Cheyenne Tribal Court orders or on Tribal law charges are held for drug- or alcohol-related offenses.  The Tribal Court has a Healing-to-Wellness Program, also known as "drug court," to help connect non-violent drug offenders with services to minimize recidivism.  To participate in the Healing-to-Wellness Program, offenders must have access to services in Lame Deer and appear before the Tribal Court once per week.  Inmates being held in distant facilities are unable to participate in the program and since the local LDADC closed, participation in the Healing-to-Wellness program has declined.

The Tribe has made repeated requests to Defendants in the last few years to increase staffing of the Tribe's police department, to improve the Tribe's local and regional detention facilities, to improve the police department's responsiveness and professionalism, and to provide rehabilitation services, without success.

Defendants' failure to provide adequate law enforcement services to Plaintiff's Reservation has injured Plaintiff. The lack of detention facilities causes police to not arrest offenders because there is no facility available to hold persons after arrest. There are over 1,000 open arrest warrants within the Reservation because there is no detention facility to hold these persons once they are arrested. Data publicly released by Defendants states that between 2019 and 2020, reported

violent crime on the Reservation increased 50%, but Defendants' inadequate recordkeeping means that there is not reliable and accurate crime data for the Reservation.  Further, the lack of response to calls for service, due to inadequate staffing, results in many Tribal members deciding not to call the police for assistance, leading to underreporting of crime.  But crime is still occurring;  non-violent crime, including drug-related crimes, is rampant.  There is a major problem with missing persons within the Reservation; Tribal members regularly disappear and such cases receive little law enforcement attention.

## 2.     Basis for Federal Jurisdiction and Venue

This Court has jurisdiction over the subject matter under 28 U.S.C. §§ 1331, 1361 and 1362 because this is a civil action arising under the Constitution, laws and treaties of the United States, including 5 U.S.C. § 702; 25 U.S.C. §§ 13, 2801, 2802 and 3601; 18 U.S.C. §§ 1152 and 1153; the 1868 Treaty of Fort Laramie, 15 Stat. 655 (May 10, 1868); 25 C.F.R. Part 12; and the common law of trusts; and is brought by an Indian tribe with a governing body duly recognized by the Secretary of the Interior, to compel Defendants to perform duties owed to Plaintiff.

Venue is proper in the District of Montana under 28 U.S.C. § 1391(b) and (e) because an officer or employee of the United States is a defendant and a substantial part of the events or omissions giving rise to the claim occurred in this District. Specifically, the events or omissions occurred in Rosebud and Big Horn Counties,

where the Tribe's Reservation is located. For the same reason, venue is proper in this Division under L.R. 3.2(b)(1).

**3.      Factual and Legal Basis of Each Claim.**

A.      *Law Providing Source of Defendants' Duties*

A tribe properly brings a breach of trust claim against the federal government when it "identif[ies] a substantive source of law that establishes specific fiduciary duties, and allege[s] that the Government has failed faithfully to perform those duties." *United States v. Navajo Nation*, 537 U.S. 488, 506 (2003) (citing *United States v. Mitchell*, 463 U.S. 206, 216-17, 219 (1983) (*Mitchell II*).   Though the United States Supreme Court has long recognized "the undisputed existence of a general trust relationship between the United States and the Indian people," *Mitchell II*, 463 U.S. at 225, in order for a tribe to bring a cognizable claim for breach of trust, a "substantive right must be found in some . . . source of law, such as the Constitution, or any Act of Congress, or any regulation of an executive department." *Id.* at 216 (internal quotation omitted); *see also United States v. Jicarilla Apache Nation*, 131 S. Ct. 2313, 2318 (2011) (stating "trust obligations of the United States to the Indian tribes are established and governed by statute rather than common law").

While *Navajo Nation* and "*Mitchell II* involved a claim for damages, nothing in that decision or other Indian cases would imply that appellants are not entitled to

6

declaratory or injunctive relief.  Such remedies are the traditional ones for violations of trust duties." *Cobell v. Norton*, 240 F.3d 1081, 1101 (D.C. Cir. 2001); *see also id.* at 1107-08; *Tohono O'Odham Nation v. United States*, 79 Fed. Cl. 645, 657 (2007) ("[A] traditional common law breach of trust claim is an action in equity …. As is explained in the Restatement (Second) of Trusts, in addition to seeking purely injunctive or declaratory relief, the beneficiary can recover any loss or depreciation in value of the trust estate resulting from the breach of trust.") (internal citations omitted).

Numerous substantive sources of law establish and evince the federal government's longstanding, specific fiduciary duty to provide effective law enforcement for tribes.  *See United States v. Kagama*, 118 U.S. 375, 384 (1886) ("[D]ue to the course of dealing of the federal government with [the Tribes], and the treaties in which it has been promised, there arises the duty of protection, and with it the power."); *Ex parte Crow Dog*, 109 U.S. 556, 569 (1883) ("The corresponding obligation of protection on the part of the government is … that each individual shall be protected in his rights of property, person, and life, and that obligation was to be fulfilled by the enforcement of the laws then existing to those objects, and by the future appropriate legislation which was promised to secure to them an orderly government.").  The laws we would rely upon to establish this fiduciary duty include:

- The Treaty of Fort Laramie with the Northern Cheyenne and Northern Arapaho, 15 Stat. 655 (May 10, 1868)

- Indian Law Enforcement Reform Act (25 U.S.C. Chap. 30), *i.e.* 25 U.S.C. § 2802

- ILERA implementing regulations (25 C.F.R. Part 12)

- Tribal Law and Order Act (25 U.S.C. § 2801 note, P.L. 111-211)

- Indian Tribal Justice Act (25 U.S.C. Chap. 38)

- Major Crimes Act (18 U.S.C. § 1153)

- Indian Country Crimes Act (18 U.S.C. § 1152)

- Snyder Act (25 U.S.C. § 13)

B.    *Claim I: Declaratory Relief.*

Plaintiff requests that the Court declares, pursuant to the authority granted the Court under 28 U.S.C. § 2201(a) and under the common law of trusts, that Defendants have failed to fulfill their legal obligations to provide law and order on the Reservation. The well-established trust relationship between Defendants and Plaintiff, and the fiduciary duties assumed therein, are derived from multiple treaty, statutory, and regulatory provisions governing the administration of law and order within Indian country. However, despite this delineated duty, Defendants have failed to provide adequate law and order services to the Reservation. This breach is

materialized in many ways including by Defendants' failure to: (1) maintain adequate police staffing levels; (2) respond to calls for service by Tribal members; (3) properly investigate crimes; (4) refer cases for prosecution; (5) maintain adequate local and regional detention facilities; and (6) provide adequate rehabilitative services.

C.    *Claim II: Mandamus Relief.*

Defendants have failed to perform their nondiscretionary duties to the Tribe and there is no adequate administrative remedy available. Plaintiff requests that the Court compel Defendants, pursuant to the authority granted to the Court under 28 U.S.C. § 1361, to perform their duties owed to Plaintiff to provide adequate law enforcement services. Defendants have nondiscretionary duties to comply with the treaty, statutes, and regulations cited in Plaintiff's complaint. Defendants have failed to provide adequate law enforcement and correctional services on the Reservation, which has resulted in an increase in crime rates, slow response times or no response at all to 911 calls made by Tribal members, and over 1,000 open arrest warrants for persons who might be found on the Reservation. Despite clearly outlined, nondiscretionary duties to provide law enforcement services to the Reservation, Defendants have left Plaintiff without an appropriately staffed police department and correctional facilities that can adequately house offenders.

D.    *Claim III: Injunctive Relief.*

Defendant's failure to provide law and order on the Reservation has resulted in irreparable injuries to Plaintiff for which Plaintiff is without remedies. The Court has authority to award injunctive relief under 28 U.S.C. § 2202 and the common law of trusts.  Where the balance of hardships strongly favors injunctive relief and such relief is in the public interest, a plaintiff should be awarded such relief requested. As a direct result of Defendant's inadequate law and order services, the Tribal Court is unable to properly function. Defendants' officers fail to properly collect and store evidence to be used by Tribal and Federal prosecutors, and officers often fail to appear at court hearings which often amounts to the dismissal of criminal actions. In addition, Defendants' officers fail to respond to Tribal members' 911 calls are and when they do respond, offenders are either not jailed or are driven some 1,000 miles away for detention in Oklahoma. These inadequacies have resulted in high rates of alcohol- and drug-related crimes and crimes related to missing and murdered Indigenous persons on the Reservation. The balance of hardships strongly favors injunctive relief, and such relief is squarely in the public interest.

    E.    *Claim IV: Equitable Relief.*

Plaintiff seeks reimbursement and restitution from Defendants of funds Plaintiff spent on law enforcement functions that should have been funded and provided by Defendants. Plaintiff attempted to improve the failing federal system of law and order on the Reservation by taking actions to increase public safety. To date,

the Tribe has spent over $1,000,000 of its own monies to provide law enforcement services on the Reservation, including safety checkpoints. These funds would not have been expended but for Defendants' failure to uphold their duty to provide law and order services to the Reservation. Restitution and other equitable remedies are typical remedies for breach of fiduciary duty. *See* Restatement (Third) of Trusts § 95 (2012).

**4.    Computation of Damages.**

Plaintiff is not seeking damages.  If successful, the Tribe would seek costs and attorney fees under 28 U.S.C. § 2412 and any other applicable law.

**5.    Status of Related State or Federal Litigation.**

There is not currently any related state or federal litigation pending between Plaintiff and Defendants. The parties are currently attempting to resolve issues relating to negotiation of a self-determination contract for Plaintiff to administer Defendants' dispatch functions within the Reservation and Plaintiff hopes that litigation over the contract can be avoided.  Plaintiff will notify the Court if and when related litigation commences.

Another tribe in another District has filed a lawsuit against Defendants alleging similar breach of trust claims relating to law enforcement.  That case, *Oglala Sioux Tribe v. United States*, 5:22-CV-05066-RAL (District of South Dakota), is

currently in discovery after the Plaintiff Tribe defeated a motion to dismiss and partially prevailed in obtaining a preliminary injunction.

**6.    Proposed Additional Stipulations of Fact Not Included in the Joint Statement of Stipulated Facts**

Plaintiffs propose these additional stipulations of fact, which were admitted in Defendants' Answer (ECF No. 36) but to which Defendants would not agree to include in the Joint Statement of Stipulated Facts (ECF No. 50):

A.    Northern Cheyenne Tribal members are accustomed to calling 911, which is administered by BIA-OJS under its telecommunications/dispatch function for emergency assistance.

B.    Without a permanent chief of police, officers from outside the Reservation rotate through as "acting" chiefs, often staying only 30 days before being replaced by another officer in "acting" status.

C.    The Tribe has made repeated requests to Defendants in the last few years to increase staffing of the Tribe's police department, to improve the Tribe's local and regional detention facilities, and to improve the police department's responsiveness and professionalism.

D.    On December 15, 2020, the Tribe filed suit against OJS challenging BIA-OJS' declination of the Tribe's Indian Self-Determination and Education Assistance Act ("ISDEAA") contract proposal for the criminal investigations program.

E.     On November 24, 2021, BIA-OJS and the Tribe executed Contract No. A22AV00387, whereby the Tribe assumed and began operating the criminal investigations program under the Tribally-administered Northern Cheyenne Investigative Services ("NCIS") with funding from BIA-OJS under the ISDEAA.

F.     The Tribe hired two former BIA police officers to work for the NCIS. NCIS assumed responsibility for staffing Tribal checkpoints.

G.     Until December 3, 2021, criminal investigators on the Reservation were funded, employed, and managed by BIA-OJS.

H.     In addition to BIA-OJS, NCIS works with the United States Department of Justice, Federal Bureau of Investigation, and the Drug Enforcement Agency.

I.     BIA-OJS funds Division of Drug Enforcement ("DDE") and Missing and Murdered Unit ("MMU") agents on a national level to provide specialized investigative services to tribes.

J.     National-level DDE agents are not assigned to the Northern Cheyenne Reservation specifically and BIA declined Plaintiff's request to contract a DDE Special Agent position under the ISDEAA.

K.     There are no MMU agents assigned to the Reservation specifically.

L.    The local Lame Deer Adult Detention Center ("LDADC") is located within the Reservation. After operating for many years, BIA closed it in 2019 due to overcrowding and the facility's poor condition.

M.    The Tribe repeatedly asked BIA to re-open LDADC in any capacity, in the short term, while working toward re-opening the facility to full capacity. It reopened in June 2021 as a temporary hold facility for no more than nine detainees, who can be held up to only eight hours and only on intoxication charges.

N.    OJS closed the Busby Youth Services Center for repairs on October 23, 2022.  Since that time, OJS has been using the LDADC to hold juveniles on a temporary basis. The LDADC cannot be used to hold any adults when juveniles are present.

O.    The primary adult detention facility for the Northern Cheyenne Reservation is the Rocky Mountain Regional Detention Facility ("RMRDF") in Hardin, Montana, which opened in April 2019.

P.    Since April 2019, BIA utilizes the RMRDF through a contract with the facility to house BIA-OJS detainees. It is a 400-bed facility but currently only accepts approximately 100 detainees, which is further divided between detainees from the Crow Reservation and the Reservation.

Q.    The RMRDF is 56 miles from the Tribe's headquarters in Lame Deer.

R.    If an arrestee should be detained for longer than eight hours and for any reason other than intoxication, law enforcement personnel must dedicate at least two hours for round-trip travel between Lame Deer and Hardin.

S.    Due to RMRDF's limited capacity, BIA frequently sends detainees from the Reservation to contract detention facilities in Oklahoma, approximately 1,000 miles away. One regularly used facility is in Kay County, Oklahoma which is nearly a 2,000-mile roundtrip from Lame Deer.

T.    The majority of persons detained by BIA-OJS under Northern Cheyenne Tribal Court orders or on Tribal law charges are held for drug- or alcohol-related offenses.

U.    The Tribal Court has a Healing-to-Wellness Program, also known as a "drug court," to help connect non-violent drug offenders with services to minimize recidivism.

V.    There are approximately 1,000 open arrest warrants on the Reservation.

W.    On May 10, 2022, the Tribe sent Defendants a formal request for action. That letter demanded immediate action to increase staffing of

the Tribe's police department, fully reopen LDADC, and address capacity limitations at the RMRDF within 60 days.

X.     As of July 19, 2022, Defendants had not responded to the Tribe's letter.

Plaintiff expects to propose stipulations of fact not included in the parties' Statement of Stipulated Facts after discovery is completed.

**7.     Proposed Deadline for Joinder and Amending Pleadings.**

The parties' joint discovery plan (ECF No. 49) proposes January 15, 2024 as the deadline for joinder of parties and amending pleadings.  Plaintiffs do not intend to join any other parties, but reserve the right to amend the Complaint based on new information and changing circumstances.

**8.     Identification of Controlling Issues of Law for Pretrial Disposition.**

Resolution of this action will involve interpretation of the treaty, statutes and regulations in Part 3.A above, as well as application of the common law of trusts and specifically common law germane to breach of trust claims, to the facts stated above, as supplemented if necessary and appropriate.  Whether Defendants have fiduciary duties related to law enforcement is an issue of law that could be resolved on summary judgment.  Whether Defendants have breached those duties could also be resolved on summary judgment.  Some or all of Defendants' affirmative defenses may be addressed on summary judgment as well.

9.    **Identification of Each Individual with Information.**

Plaintiff's current and former elected officials, employees and Tribal members, as well as Defendants' current and former appointed officials and employees, have potentially discoverable information that Plaintiff would use to support its claims. A complete list of such individuals will be disclosed to Defendants in Plaintiff's initial disclosures under Fed. R. Civ. P. 26.

10.   **Insurance Agreement**

There is no insurance agreement that may cover the resulting judgment; regardless, no money damages are sought.

11.   **Settlement Discussions**

The parties spent the better part of a year attempting to resolve this case. The parties met in person twice, exchanged several detailed letters, and counsel for the parties had several phone calls, all with the goal of resolving this case.  Based on these discussions and the nature of the claims, at this time Plaintiff believes it unlikely that the parties will be able to settle this case.

12.   **Suitability of Special Procedures**

None.

Dated this 19th day of October, 2023.

Respectfully submitted,

/s/ Brian W. Chestnut
Brian W. Chestnut, WA Bar #23453 (*pro hac vice*)

Beth Baldwin, WA Bar #46018 (*pro hac vice*)
Anna E. Brady, Montana Bar #66826441
Liliana Elliott, AZ Bar #038284 (*pro hac vice*)

ZIONTZ CHESTNUT
2101 Fourth Avenue, Suite 1230
Seattle, WA 98121
Tel. (206) 448-1230
Fax (206) 448-0962
bchestnut@ziontzchestnut.com
bbaldwin@ziontzchestnut.com
abrady@ziontzchestnut.com
lelliott@ziontzchestnut.com

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I certify that on October 19, 2023, I served a copy of the foregoing upon the parties as follows:

| | |
|---|---|
| RANDY J. TANNER<br>Assistant U.S. Attorney<br>U.S. Attorney's Office<br>P.O. Box 8329<br>Missoula, MT 59807<br>101 E Front Street, Suite 401<br>Missoula, MT 59802<br>Phone: (406) 329-4268<br>FAX: (406) 542-1476<br>Email: randy.tanner@usdoj.gov | Via:<br><br>[X] CM/ECF<br>[  ] U.S. First Class Mail<br>[  ] Email<br>[  ] Fax |
| MARK STEGER SMITH<br>Assistant U.S. Attorneys<br>U.S. Attorney's Office<br>2601 Second Avenue North, Suite 3200<br>Billings, MT 59101<br>Phone: (406) 247-4667<br>Fax: (406) 657-6058<br>Email: Mark.Smith3@usdoj.gov<br><br>*Attorneys for Defendants* | Via:<br><br>[X] CM/ECF<br>[  ] U.S. First Class Mail<br>[  ] Email<br>[  ] Fax |

Dated this 19th day of October 2023.

s/ Laura Bartholet
Laura Bartholet, Paralegal/Legal Assistant